# Exhibit A

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF CALIFORNIA

3                ---oOo---

4   BEFORE THE HONORABLE GARLAND E. BURRELL, JR., CHIEF JUDGE

5

6   UNITED STATES OF AMERICA, ex rel.

7   MARY HENDOW and JULIE ALBERTSON,

8

        Plaintiffs,

9

   Vs.                   CASE NO. CIV. S-03-457 GEB

10

   UNIVERSITY OF PHOENIX,

11

12        Defendant.

13  _____/

14

15

16

17                ---oOo---

18

19          REPORTER'S TRANSCRIPT

20        MONDAY, JUNE 25TH, 2007

21        RE:  MOTION TO DISMISS

22

23                ---oOo---

24

25  Reported by:          CATHERINE E.F. BODENE,
                      CSR. No. 6926

```
 1                          APPEARANCES

 2                          ---o0o---

 3

 4     For the Plaintiff Relators:

 5          ALTSHULER BERZON LLP
            177 Post Street, Suite 300
 6          San Francisco, California  94108

 7          BY:  MICHAEL RUBIN, Attorney At Law
            BY:  PETER E. LECKMAN, Attorney At Law
 8

 9
            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
10          275 Battery Street, 30th Floor
            San Francisco, California  94111
11
            BY:  ROBERT J. NELSON, Attorney At Law
12

13
            NANCY G. KROP, Attorney At Law
14          274 Redwood Shores Parkway, No. 334
            Redwood City, California  94065
15

16          DANIEL ROBERT BARTLEY, Attorney At Law
            7665 Redwood Blvd., Suite 200
17          Novato, California  94945-1405

18

19

20     For the Defendant University of Phoenix:

21          GIBSON, DUNN & CRUTCHER LLP
            333 South Grand Avenue
22          Los Angeles, California  90071-3197

23          BY:  TIMOTHY J. HATCH, Attorney At Law
            BY:  JAMES L. ZELENAY, Jr., Attorney At Law
24

25                          ---o0o---
```

1               APPEARANCES

2                 ---o0o---

3

4    For USA:

5            JAY MAJORS, Attorney
             CIVIL DIVISION - FRAUD SECTION
6            COMMERCIAL LITIGATION BRANCH
             US DEPARTMENT OF JUSTICE
7            P.O. Box 261, Ben Franklin Station
             Washington, DC  20044
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1       SACRAMENTO, CALIFORNIA

2       MONDAY, JUNE 25TH, 2007 - 10:00 AM

3                   ---o0o---

4       THE CLERK:  Calling 03-457, Hendow versus University

5    of Phoenix.

6       THE COURT:  Please, state your appearances.

7       MR. RUBIN:  Good morning, Your Honor.  For the

8    Relators, I'm Michael Rubin.  I am also from San Francisco.

9       MR. NELSON:  Good morning, Your Honor.  For the

10   Relators, my name is Robert Nelson, from the law firm of

11   Lieff Cabraser.  I'm also from San Francisco.

12      MS. KROP:  Good morning, Your Honor.  Nancy Krop

13   appearing for the Law Office of Nancy Krop from Redwood City,

14   California.

15      MR. LECKMAN:  Good morning, Your Honor.  Peter

16   Leckman also on behalf of Relators, Altshuler Berzon.

17      MR. BARTLEY:  Good morning, Your Honor.  Daniel

18   Bartley on behalf of the Relators from Novato, California.

19      MR. MAJORS:  Your Honor, Jay Majors from the

20   Department of Justice, Washington, D.C.  Should the Court

21   wish to hear the government's perspective, I'm here to offer

22   that.

23      MR. RUBIN:  Your Honor, I will be making the

24   principal arguments on behalf of the Relators.

25      MR. HATCH:  Timothy Hatch of Gibson, Dunn and

2

1   Crutcher.

2           MR. ZELENAY:   Jim Zelenay from Gibson, Dunn and

3   Crutcher.

4           THE COURT:   All right.   Go ahead.

5           MR. HATCH:   Thank you, Your Honor.

6           The motion before you, we believe, involves three

7   primary issues.   The first issue is whether or not the

8   settlement agreement with the Department of Ed is an

9   alternate remedy.

10          The second issue is if it is an alternate remedy,

11  what is the consequence, does it justify dismissal of this

12  action as we urge in our motion?

13          And the third issue is what, if any, impact does the

14  language in the settlement agreement have in our motion, the

15  language with regard to the release of FCA liability.

16          What I'd like to do, Your Honor, is address the first

17  two issues quite quickly, and then focus on the third issue

18  because, at least based on the motions and briefs that have

19  been filed with you, that really does seem to be the crux of

20  the argument here.

21          With regard to whether or not the Department of Ed's

22  program review and settlement agreement constitutes an

23  alternate remedy, we think that clearly it does.

24          Miss Woodward, Jennifer Woodward, an attorney with

25  the Department of Education, has submitted declarations

3

1   describing the genesis and purpose of the program review.
2   She has stated that the program review was "unique" -- that's
3   her word -- because its genesis was the qui tam complaint.

4         She has also stated that the purpose was to
5   substantiate the allegations made by Relators -- and again
6   her words -- "quantify the extent of violations in order to
7   set an appropriate fine amount."

8         This description, Your Honor, we contend, is on all
9   fours with the statutory definition of alternate remedy,
10  which is any administrative proceeding to determine a civil
11  money penalty. This acknowledgment by Miss Woodward, we
12  believe, is very telling.

13        In addition, the similarities between the allegations
14  in the complaint and the alleged findings of the program
15  review report are striking.

16        Now, it turns out that that is not all that
17  surprising since Relators and their counsel essentially
18  directed the conduct of the program review and that the
19  program review essentially validated the allegations of the
20  Relators.

21        In fact, the nexus between the program review and
22  settlement agreement and the underlying qui tam action in
23  this case is much greater, much closer than the nexus between
24  the suspension/debarment proceedings and settlement agreement
25  and the underlying qui tam action in the Barajas case in

4

1   which the Ninth Circuit held that the Air Force

2   suspension/debarment agreement constituted an alternate

3   remedy.

4       Now, we are not saying, Your Honor, that every

5   program review is an alternate remedy.  We acknowledge that

6   is not the case.  In fact, we think, like in Barajas, it

7   would be the rare circumstance in which that would be the

8   result.  But in this case, as Miss Woodward stated, this

9   program review was unique.

10      Finally, Your Honor, with regard to whether this is

11  an alternate remedy, we would point Your Honor to the letter

12  written by Relators' counsel in August of 2004

13  contemporaneous with the program review and the settlement

14  negotiations in which he acknowledged that it was an

15  alternate remedy, and that they, indeed, would be expecting

16  their share of any recovery from the government no matter

17  what vehicle is used to obtain that recovery.

18      So let's turn briefly to the second issue.

19      If it is an alternate remedy, which, of course, we

20  contend it is, what is the proper result?

21      Does it justify dismissal of the action, or to frame

22  the issue in another way, can the alternate remedy provision

23  in the False Claims Act be used to protect or shield the

24  defendant, or is its sole purpose to protect and shield the

25  Relator and the Relators' interest?

5

1           We contend, Your Honor, that the plain language of
2   the statute, the legislative history and Barajas all support
3   UOP's position.

4           As the Ninth Circuit made very clear in Barajas, and
5   I quote (Reading):

6               "The use of the term alternate remedy makes clear
7               that the government must choose one remedy or the
8               other.  It cannot choose both."

9               (Reading concluded.)

10          Now, the Relators and DOJ both assert, without citing
11  any authority, that the purpose of the alternate remedy was
12  limited to protecting the interest of Relators and that it
13  was not intended to also protect the interests of the
14  defendants.

15          This is clearly wrong.  And we would point Your Honor
16  to the legislative history that we've cited in our briefs,
17  that is contrary.

18          We would also point Your Honor to the Sixth Circuit
19  decision in the Bledsoe case in which the Sixth Circuit
20  clearly recognized that the alternate remedy provision
21  protects the interests of the defendants as well as the
22  interests of the Relators.

23          Finally, Your Honor, in Barajas the Department of
24  Justice made this same argument to the Ninth Circuit, and I
25  quote (Reading):

6

1          "The provision is for the benefit of the government

2          and secondarily for the Relator, but it is not to be

3          invoked by the defendant."

4          (Reading concluded.)

5      The Ninth Circuit did not accept or adopt the DOJ's

6   position.

7      We believe that the clear result of the government's

8   pursuit of an alternate remedy is that the qui tam action

9   must be dismissed, and the only issue before this Court is to

10  determine the Relator's share of the 9.8 million dollars that

11  UOP paid to the government.

12     The final issue, Your Honor:  The relevance, if any,

13  of the language in the settlement agreement.

14     There are two primary arguments we would like to make

15  on this point, Your Honor.

16     The first is no matter how many times the Relators

17  and DOJ assert to the contrary, the simple fact is that we're

18  not arguing that the settlement agreement somehow settled

19  this action or released UOP from liability under the FCA.

20     We are not raising an accord and satisfaction

21  defense.  There are clear and significant differences between

22  an argument that the program review and settlement

23  constituted an alternate remedy and that the settlement

24  agreement contractually released UOP from potential FCA

25  liability.

7

1          The fact that both arguments might get to the same or

2     similar result does not mean they're the same argument or the

3     same vehicle.

4          Now, this critical and obvious distinction was

5     clearly recognized by both the Sixth Circuit and the Ninth

6     Circuit in their respective cases involving alternate remedy.

7          In Bledsoe, the Sixth Circuit found that the

8     settlement agreement constituted an alternate remedy

9     notwithstanding the fact that the settlement agreement

10    specifically reserved and excluded the qui tam action from

11    the scope and terms of the release.  They identified it by

12    name, the specific action, which is not the case in this

13    settlement agreement.

14         And in Barajas, once again the DOJ made the same

15    argument it's making here, that a settlement agreement cannot

16    constitute an alternate remedy unless it specifically

17    includes FCA liability in the scope of the release.

18         The DOJ did not accept DOJ's -- I'm sorry.  The Ninth

19    Circuit did not accept DOJ's argument there and found that

20    the suspension/debarment agreement did constitute an

21    alternate remedy.

22         The second argument -- the second issue I would like

23    to point your attention to, Your Honor, is if you look at the

24    language of the settlement agreement, it is not nearly as

25    broad or as expansive as Relators or DOJ would argue.

8

1    The settlement agreement states quite clearly that
2    this agreement -- I'm sorry -- (Reading):
3         The Department of Education does not have the
4         authority to, and this agreement does not waive,
5         compromise, restrict or settle False Claims Act
6         liability as well as criminal liability.
7         (Reading concluded.)
8    It is important, Your Honor, that the key to this
9    provision is the scope of the Department's authority.  The
10   provision does not say -- does not start with the terms:
11        This agreement does not waive, compromise...
12        It starts with (Reading):
13        The Department does not have the authority and this
14        agreement does not waive, compromise, restrict or
15        settle.
16        (Reading concluded.)
17   So what the scope of this agreement is is dependent
18   on what the Department has the authority to do.  The
19   Department of Education does not, Your Honor, have the
20   authority to settle or resolve criminal matters or matters
21   under the False Claims Act.
22        The Department of Education quite clearly does, Your
23   Honor, have the authority to pursue an alternate remedy.
24   That's made abundantly clear in the declaration submitted by
25   Miss Woodward in which she says that the purpose was to

9

1    quantify the extent of violations in order to set an
2    appropriate fine amount.

3         In fact, the Department of Education has the
4    authority to fine institutions up to $27,500 per violation.
5    That's almost three times the amount that the Department of
6    Justice can assess under the False Claims Act.

7         Finally, in yet another declaration that was just
8    recently submitted by Miss Woodward, that we have not
9    submitted to the Court because we just got it within the past
10   week, she actually acknowledged that the Department of
11   Education has the authority not only to assess fines, but to
12   pursue penal sanctions.

13        So clearly the Department does have the authority to
14   pursue an alternate remedy, and that means that under the
15   language of the settlement agreement, which carves out from
16   the release those matters which the Department does not have
17   authority to deal with, this alternate remedy would not be
18   included.

19        We think, Your Honor, that the second sentence of
20   this paragraph E is also instructive to inform the Court that
21   the parties were not intending a broad carve out.  And that
22   sentence says (Reading):

23             Notwithstanding the preceding sentence, the
24             Department, [the Department of Ed] warrants and
25             acknowledges that it is not presently aware of any

10

1      investigation, regulatory proceedings or

2      administrative or enforcement actions currently

3      contemplated by or pending before the Department or

4      any other federal agency that relate to the subject

5      matter of this agreement.

6      (Reading concluded.)

7         So here the parties were clearly contemplating a very

8   narrow carve out, and an alternate remedy would not fit

9   within the scope of the release given the plain language of

10  that provision.

11        In conclusion, Your Honor, I would like to take a

12  brief step back and look at where we are and how we got here.

13        The lawsuit was filed alleging violations of the

14  incentive compensation rules.  DOJ declined to intervene in

15  the lawsuit.  In light of the DOJ's declination, Ed conducted

16  a program review of the very same issue.

17        It was thorough, it was hostile, and we believe it

18  was fundamentally flawed.  In fact, as we now know, the

19  Department of Ed staff responsible for the program review

20  worked hand in glove with Relators in planning and conducting

21  that review.

22        Notwithstanding UOP's violent disagreement with the

23  findings of the flawed program review report, UOP agreed to

24  settle it by paying the government 9.8 million dollars.

25        Now, rather than be thankful that they get a portion

11

1   of the 9.8 million, an amount -- an act we don't believe

2   would be justified based on the value of the case or the

3   contribution of Relators -- the Relators attack the

4   Department of Ed for agreeing to a low-ball settlement and

5   seek a second bite of the apple.

6          Consistent with the Ninth Circuit's guidance that the

7   government must choose one remedy or the other, it cannot

8   choose both.  We contend that the government's interests have

9   been served, the Relators' greed should not be rewarded, and

10  UOP should not be subjected to further disruptive and

11  expensive litigation.

12         Thank you, Your Honor.

13         MR. RUBIN:  Thank you, Your Honor.

14         Michael Rubin for the Relators.

15         I think it would be most helpful if I start pretty

16  much where Mr. Hatch finished, and that's focusing on the

17  language of the settlement agreement itself because there the

18  parties to the Department of Education program review made

19  clear in negotiated language between sophisticated parties

20  that the program review settlement was resolving only the

21  program review and was not and could not settle any qui tam

22  claims.

23         The qui tam statute itself provides in Section

24  (c)(2)(B) --

25         THE COURT:  Similar language was used in the Bledsoe

12

1    case.   So how do you distinguish this case from that case?

2         MR. RUBIN:   In the Bledsoe case, language was used to

3    preclude the Relators from getting their share of the

4    recovery, which violated (c)(5) which explicitly says that if

5    an alternate remedy is pursued, the Relators have the same

6    rights to participate as they would have had in the qui tam

7    case.

8         As the Sixth Circuit made clear in Bledsoe, it would

9    be unfair to the Relators, and therefore contrary to the

10   legislative purposes, to permit other parties to a contract

11   to resolve the underlying claims.

12        And in Bledsoe, the claims that were resolved were,

13   in fact, the very same qui tam claims Relators asserted.   It

14   would be unfair to Relators to resolve those and preclude

15   them from reach and recovery.

16        Similarly, in the Barajas case, the Ninth Circuit

17   made clear that this alternate remedy provision was put in

18   there to protect Relators, to encourage Relators to go

19   forward.   Because as the Ninth Circuit said, in the

20   circumstances of this case -- and that's a phrase they used

21   four different times in that opinion -- it would be unfair

22   and unjust because what happened in Barajas?

23        Barajas you had the initial qui tam filing where the

24   government did intervene.

25        Then there was a second qui tam case filed by that

13

1   same Relator.

2          What the government did is it settled the first

3   qui tam case while the second qui tam case was pending.  The

4   result of that settlement was to preclude the second case

5   from going forward, a claim preclusion, because both qui tam

6   claims arose out of the same transaction or occurrence.

7          In settling that first case, the government carved

8   out the suspension and debarment proceedings of the

9   Air Force.

10         It said effectively the qui tam case is over, we are

11  electing through our settlement to proceed by this alternate

12  route in lieu of the qui tam claims.

13         And what the Ninth Circuit said there is in fairness

14  to the Relator, in order not to discourage Relators from

15  coming forward and asserting qui tam claims, we're going to

16  protect their rights.  We're going to make sure that if the

17  government acts in conjunction with a qui tam defendant to

18  resolve the underlying qui tam claim and carve out the

19  Relators' rights, we are going to insist that the Relators

20  continue to be protected.

21         (c)(5) was put in in the '86 --

22         THE COURT:  My question was not aimed at trying to

23  find out if the Relators are being protected.  I wasn't

24  driving at that with my question.

25         I was trying to focus on the language in the Sixth

14

1   Circuit opinion.  And I don't -- I have the opinion on the

2   bench, but I don't have that language in mind.

3            MR. RUBIN:  Right.

4            THE COURT:  But, in essence, what I understand

5   happened in that case is that there was a settlement that

6   purportedly did not affect the on-going qui tam action.  And

7   the Circuit, notwithstanding that language, said that it did.

8   And so that's what I was trying to ask you.

9            MR. RUBIN:  It is because -- I'll quote the language

10  on page 648 and 649 to help refresh Your Honor's

11  recollection.

12           But even though it purported to preserve the qui tam

13  action, the Sixth Circuit said it did not in fact, that the

14  practical effect was to destroy the qui tam action.

15           Therefore, the Sixth Circuit said at page 648 to 649

16  (Reading):

17           The point of this alternate remedy provision,

18           3730(c)(5), is to prevent the government from

19           declining to intervene in a qui tam suit, then settle

20           that suit's claim separately and deny Relator his

21           or her share of the settlement proceeds simply

22           because the government did not formally intervene.

23           (Reading concluded.)

24           Then it said on 649 (Reading):

25           Such a result, that is to settle the case in a way

15

1          that effectively destroys the qui tam action, such a

2          result would not further Congress' intent that the

3          government and private citizens collaborate in

4          battling fraud claims.  And it would impede, not

5          further Congress' legislative intent to encourage

6          private citizens to file qui tam suits.

7          (Reading concluded.)

8      Then the same point at page 650, this is the last

9  quote that I'll give you (Reading):

10          The government may not settle Relators' claims.

11          (Reading concluded.)

12      Again, this points out that despite the attempted

13  carve out, the Sixth Circuit recognized that the actual

14  effect of the government's settlement in Bledsoe would be to

15  settle and irrevocably resolve the claims.

16      The government may not settle the Relators' claims

17  and seek to avoid paying the Relator his or her statutory

18  share out of the settlement of proceeds by excluding

19  Relators' claims from the terms of the settlement agreement.

20      So the Sixth Circuit construed (c)(5) as not

21  permitting an agreement between the government and the

22  Relator that had the effect of throwing the Relator out of

23  court, but included language that was essentially an

24  artifice, that purported to preserve rights that, in fact,

25  had been resolved.  That's what would be inconsistent with

16

1    the intent.

2          Here, there was no alternate remedy at all.  This

3    Department of Education program review was an administrative

4    procedure that at no point supplanted the qui tam action.

5          The University of Phoenix asserts the position,

6    asserted it throughout the brief, asserts it today, that the

7    election under (c)(5) occurs after the government has

8    declined intervention as soon as some administrative agency

9    initiates administrative proceedings.

10          That's what they said throughout the brief.

11          Once the government declines, if any administrative

12    agency, with any jurisdiction over any fact that is raised in

13    the qui tam case starts an administrative procedure, that's

14    the governmental election, and that ends the qui tam case.

15          That cannot be true.

16          How do we know that can't be true?

17          Because the statute tells us in two separate

18    provisions that even after an administrative agency commences

19    an administrative proceeding, even if the government has

20    declined, the qui tam case can go on further.

21          In fact, the government can later intervene in that

22    qui tam case even if it has initially declined to intervene.

23          (c)(4), for example, says that whether or not the

24    government proceeds with a qui tam action, that is whether

25    the government chooses to intervene or, as here, initially

17

1  chooses not to intervene, the government may decide to object
2  to discovery in the on-going qui tam action if it might
3  interfere with some other action.

4       That is an express recognition that the initiation of
5  an administrative action does not constitute an election to
6  proceed administratively in lieu of the qui tam action.

7       Similarly, the third sentence of (c)(5) talks about
8  findings and conclusions in the alternate proceeding could be
9  binding in this action, in the qui tam action.  That could
10  only work if both proceedings could occur in parallel.

11       Now, in addition to these two express provisions,
12  (c)(5) third sentence and (c)(4), the whole structure of the
13  False Claims Act, the qui tam act, recognizes that there can
14  be these on-going proceedings.

15       If there weren't, since only the Attorney General can
16  dismiss a qui tam case, if University of Phoenix were right,
17  then once the government declined any administrative, any
18  government agency could pursue any claim civilly or
19  administratively with any factual overlap for a qui tam case,
20  covering any period of time of a qui tam case.

21       And merely by pursuing that, even if it immediately
22  dismissed it, it would require the qui tam case to be thrown
23  out.

24       That can't be.  The election can't be at the moment
25  the administrative agency pursues rights, even if the

18

1    administrative agency pursues, as in this case, program

2    review based on information obtained in the qui tam

3    complaint.

4         Where does the election occur for purposes of (c)(5)?

5         It occurs when the government, including the Attorney

6    General, decides how to resolve the case.  In Bledsoe, don't

7    forget --

8         THE COURT:  I'm sorry.  You said it occurs when the

9    government, including the Attorney General?

10        MR. RUBIN:  That's right.

11        THE COURT:  Who's the "government?"

12        What constitutes the "government" in your argument?

13        MR. RUBIN:  Under (c)(2)(B) and 3730(b), the Attorney

14   General, and Mr. Majors will address this as well, must

15   participate to resolve a qui tam case.

16        That involvement by the Attorney General is required

17   as a matter of statute before a qui tam case can be

18   dismissed.

19        In Bledsoe and Barajas the Attorney General was

20   involved.  The Attorney General in Barajas was a participant

21   in the settlement of that first claim that was claim

22   preclusive and that carved out the suspension and debarment

23   proceeding.

24        In Bledsoe as well, the Department of Justice was

25   part of the agreement.

19

1          Here, the Department of Justice was not involved.

2     The Attorney General was not involved.  It was the Department

3     of Education alone.

4          And as Mr. Hatch correctly pointed out, the

5     Department of Education has no authority to resolve a qui tam

6     case.  And the settlement agreement acknowledged that

7     explicitly and said not only do we lack authority, but this

8     agreement does not resolve the qui tam case.

9          The election -- Had the Attorney General and

10    Department of Justice been involved in the Department of

11    Education program review, Relators would have been entitled

12    to participate as well under the statute.  We could have

13    challenged that resolution.

14         But they could have reached a settlement that

15    extended over the full time period, that fully resolved the

16    case if at the same time they dismissed or sought to dismiss,

17    using their statutory authority, the qui tam case.

18         There would have been a court proceeding in front of

19    you where you would have had to determine whether that

20    Department of Education settlement was fair, reasonable and

21    adequate under the standards set forth in the False Claims

22    Act.

23         They didn't do that.  The Attorney General wasn't

24    involved.  And they couldn't do that without the Attorney

25    General because the Department of Education, by the

20

1   University's own concession, lacked the authority to resolve

2   the qui tam act case.

3        The settlement, which was negotiated at arm's length

4   between very well-represented, very sophisticated parties --

5   They made a deal.  They made a deal which was that we will

6   get this program review resolved for 9.8 million dollars, and

7   we will permit the False Claims Act claim to continue.

8        That was the choice made.  There was no election to

9   eliminate the False Claims Act claim through that review.

10  Certainly not by its initiation.  And the settlement language

11  makes clear that the parties to the agreement lacked the

12  authority and lacked the intent to resolve it.

13       What the University --

14       THE COURT:  Does the settlement amount have any

15  bearing on this action whatsoever?

16       MR. RUBIN:  Not on the issue that is now before you

17  in this action, no.

18       Whether that is fair, reasonable and adequate is not

19  before you.  Our position is it's low ball.  The University's

20  position it is fair and adequate.  You do not need to resolve

21  that.

22       All you need to determine is was that settlement

23  apparently -- was the 9.8 in consideration for some benefit,

24  some limitations, was there an explicit carve out.

25       There was a carve out.  There was a settlement for

1  less than the entire amount sought, and a False Claims Act
2  was carved out.

3      Therefore, you should construe that contract as you
4  would construe any other contract.  A deal is a deal.  It was
5  knowingly entered into.

6      The University of Phoenix is essentially trying to
7  take advantage of a statutory provision it never raised
8  before, that we don't believe is applicable here, to say that
9  the deal it struck was not the deal that the law would
10  enforce.

11      It is saying it is an unenforceable provision based
12  on a statutory provision that, as those quotations from
13  Bledsoe I read to you in the legislative history shows, is in
14  a provision that is designed to protect the Relators.

15      We, the Relators, are third-party beneficiaries of
16  that contract.  We are entitled to enforce that contract
17  provision.

18      In other -- In Bledsoe, where they didn't enforce the
19  provision, the provision was being used to harm the Relators.
20  We need to have that provision enforced to protect us and to
21  protect the government which has an on-going interest in the
22  False Claims Act, which extends over a broader time period
23  than the Department of Education program review, and where
24  the government has the right under the statute later to
25  intervene if it chooses to do so after we go through the next

22

1    stages of discovery.

2          One department alone cannot preclude the Department

3    of Justice from proceeding in a qui tam action and cannot

4    preclude Relators from proceeding in a qui tam action by

5    virtue of a settlement of an administrative claim where the

6    parties explicitly say that we are not seeking to and we do

7    not have the power to preclude the DOJ and the Relators from

8    pursuing the qui tam case.

9          If the law were otherwise, the DOJ would lose control

10   over the qui tam statute that Congress vested in the

11   Department.

12         It would mean that any agency, without the Department

13   of Justice's knowledge, let alone the Department of Justice's

14   affirmative assent, could wipe out a false claims case that

15   the government chose to let continue by the Relators.

16         If the -- Let me add one other point, Your Honor.

17         THE COURT:  Before you do, is there precedent that

18   supports the argument you just made?

19         Is there a published decision?

20         What I understand you to have argued is that the

21   authority for your argument is the Ninth Circuit Barajas case

22   and Bledsoe.  And if I read those cases, I will see that the

23   Attorney General was not involved, and that is your

24   authority.

25         But is there authority on the books that supports

23

1    your position other than those cases?

2           MR. RUBIN:  We cited the Peggy A. Bisig case.  We

3    cited the Dunleavy case out of the Third Circuit.  We cited

4    several District Court cases.  But as Judge Fletcher said,

5    writing for the majority in the Barajas case, there aren't a

6    whole lot of published decisions on what constitutes an

7    "alternate remedy."

8           So this is an issue that not -- that has not been --

9           THE COURT:  Wait a minute.

10          Is it a question about alternate remedy, or is it a

11   question about whether it should be considered an alternate

12   remedy because the Attorney General did not participate?

13          And so the authority that you just cited --

14          MR. RUBIN:  Right.

15          THE COURT:  -- does it involve the factual situation

16   that you are presenting?

17          MR. RUBIN:  There is no case that we are aware of, no

18   case that either party has cited, that involves the precise

19   situation before you.

20          This is a case of first impression where a

21   defendant -- a qui tam defendant is seeking to renege on a

22   contractual settlement agreement that carved out a False

23   Claims Act case by saying the statute precludes the

24   enforcement of this contract I knowingly, intelligently

25   entered into.

24

1    There is no case in which any defendant has made that

2    argument before so neither side has authority directly on

3    point.

4    We believe Bledsoe, Barajas, Dunleavy and Bisig

5    support our analysis.  We believe that the plain language of

6    the statute supports our analysis.

7    We also -- This is the point I was about to make.

8    Why aren't there more cases involving the alternate remedy?

9    If the University of Phoenix were right, if every

10   time -- There are plenty of qui tam cases.  I'm sure you have

11   got plenty of qui tam cases on your docket.

12   THE COURT:  If the Attorney General was involved in

13   the settlement, then you concede that the settlement would

14   look like an alternate remedy and probably would constitute

15   an alternate remedy?

16   MR. RUBIN:  Only if the Attorney General in settling

17   the case entered into a release that had the legal effect of

18   releasing the False Claims Act claims.

19   If the Attorney General had participated, and had not

20   carved out the False Claims Act, his election would have been

21   to eliminate the False Claims Act case and to pursue only

22   this alternate remedy.

23   But neither did he participate, argument number one,

24   nor did the settlement eliminate the False Claims Act claim.

25   Point two.

25

1          So there are two independent reasons under our
2    reading of the statute why we cannot be excluded.  The
3    Attorney General didn't participate, and he's the one who can
4    determine whether it is a qui tam case.  And the settlement
5    agreement itself didn't -- See, in both Bledsoe and Barajas,
6    as a legal matter, and in some of the cases a factual matter,
7    there was no qui tam case left once the practical or legal
8    impact of the settlement is factored in.

9          Claim preclusion in Barajas meant that this qui tam
10   case was gone.  The Ninth Circuit said that.  And therefore,
11   the only way to protect the Relator was by giving effect to
12   the alternate remedy provision and saying that you have the
13   right to participate just as if this were your qui tam case,
14   which is what the language of (c)(5) says.

15         In Bledsoe the government settled the underlying
16   claims.  And therefore, whether the qui tam case was carved
17   out or not, the practical effect of that settlement, as the
18   Sixth Circuit made clear, was to eliminate the qui tam case.

19         Here everyone agreed that the qui tam case could and
20   should continue.  And now, three years after the fact, after
21   not having raised this before this Court or before the
22   Supreme Court or before the Ninth Circuit, University of
23   Phoenix is coming in and saying, "Well, maybe a deal isn't a
24   deal.  In fact, forget about the bargain for consideration,
25   we're now saying that paragraph (e) is a legal nullity.  You

26

1    chose to settle this with us, you chose to pursue it, that

2    means you didn't have the power, government, to enter into

3    this contract.  And the Court's not going to enforce this

4    carve out.  Too bad for you and for the Relators, the qui tam

5    case is over, not just for the period covered by the program

6    review, but for the entire period going back and going

7    forward covered by the qui tam case."

8              There is no authority that would support that.

9              And the reason there aren't any more of these

10   alternate remedy cases is if that were the law, every single

11   time the government declined intervention, and there was any

12   administrative proceeding of any sort, or any civil action or

13   criminal action of any sort that had any factual overlap, the

14   defendants would come into court and say, "Qui tam case is

15   over, no one can proceed on this."

16             This argument has never been suggested before, which

17   is why there aren't cases on it.  Because if University of

18   Phoenix is right, then every single time after the government

19   intervenes in a qui tam action, there is any administrative

20   civil or criminal action with any factual overlap, the

21   defendant will be permitted to move to dismiss the entire

22   qui tam case with all of its facts, regardless of the time

23   period, and say that by initiating that the government

24   elected this alternate remedy.

25             And it would prevent the Attorney General from

27

1    exercising his power to determine whether to intervene later,

2    whether to seek dismissal, whether to let the case go

3    forward.

4          See, University of Phoenix set their own three

5    options in the brief that the Attorney General has.  In fact,

6    there are five.  Because what they don't talk about is that

7    the Attorney General, if he wants to have a qui tam case

8    dismissed, can seek that dismissal under 3730(b).

9          It ignores the fact that there is a set of procedures

10   available for the government to pursue, including declining

11   intervention at the outset, and then intervening later.

12         And as I'm sure Mr. Majors will tell you, it is, in

13   my experience, the current practice of the Department of

14   Justice fairly often to decline to intervene initially, to

15   continue to work with Relators, as Department of Justice has

16   continued to work with us, and then toward the end of the

17   case to revisit the issue and often to intervene after the

18   private Relators have worked up the case more.

19         That is statutorily permitted.  It is a current

20   practice of the Department of Justice.  And it is a practice

21   and policy that the University of Phoenix's argument would

22   preclude the government from doing.  Because as soon as that

23   administrative action was filed, even without DOJ

24   involvement, the qui tam case would be over.

25         And the fraud that the government wants to be

28

1    protected against, the fraud that Congress in the 1986

2    amendment added (c)(5) to empower the Relators to prosecute,

3    would go unprosecuted, unremedied.  And that's not what

4    Congress in trying to empower the Relators in '86 sought to

5    accomplish, as both the Sixth, Seventh and Ninth Circuit in

6    Barajas made clear.

7         The legislative purpose that Mr. Hatch referred to of

8    preventing double recovery, there is some reference to that

9    in the cases.  It's obviously not the driving factor if you

10   look at the legislative history quoted in the cases.  It's

11   definitely a minor consideration.  That can be dealt with at

12   the end of the case.

13        They can seek an offset.  They can present their

14   proof on that.  There is no reason to decide those issues

15   now.  But there is no double recovery.  That's not the

16   concern.

17        The concern is what was the election here?

18        Did the Attorney General elect to give up the right

19   to pursue the qui tam action, now Relator, and choose only

20   this particular proceeding as a way of remedying the fraud?

21        The Department of Justice would not have continued

22   supporting our position, would not have filed its briefs in

23   the Ninth Circuit, the Statement of Interest here if it

24   believed that it had given up that right.

25        The parties in the contract in 2004 believed,

1   intended and committed to writing their agreement that the
2   qui tam case goes on.
3          It is too late now, as a matter of contract
4   construction, as a matter of equitable estoppel, and as a
5   matter of statutory construction for the University of
6   Phoenix to come to this court in June 2007 and say no, that
7   contract provision is a nullity, that was the end of it,
8   these qui tam cases could have been, should have been
9   dismissed three years ago, we didn't, but we can do it now
10  because the government never elected to pursue that
11  Department of Education program review in lieu of qui tam and
12  did everything it could possibly do to preserve the qui tam
13  proceeding.
14         I can't imagine what more the Department of Justice
15  and the Department of Education could have done if their
16  intent was for this not to be an alternate remedy.
17         They wrote it in the contract.  They negotiated under
18  the assumption it existed, and they have acted consistently
19  since 2004 with the understanding reflected in the contract
20  language which is that the qui tam case is going forward.
21         Thank you, Your Honor.
22         MR. MAJORS:  May I be heard, Your Honor?
23         THE COURT:  Yes.
24         MR. MAJORS:  Your Honor, first to address Bledsoe and
25  Barajas.  We believe that the salient fact in Bledsoe is that

30

1    the earlier settlement that was held to block the Relators'
2    ability to proceed was negotiated and executed between the
3    defendant and the Department of Justice.

4        There was no issue of agency authority in Bledsoe.
5    It was simply a factual inquiry as to what was the scope of
6    the initial settlement that DOJ reached.

7        Similarly, in Barajas it is true that the
8    government -- that the Department of Justice did not
9    participate in the suspension and debarment proceeding with
10   the Air Force, but it is very clear from the Ninth Circuit's
11   ruling that the reason they found the suspension and
12   debarment proceeding to constitute an alternate remedy was
13   because the Attorney General, the Department of Justice, had
14   previously acted to cut off the Relators' rights through an
15   explicit False Claims Act settlement with the defendant.

16       At page 1013 of Barajas, the Ninth Circuit runs
17   through the sequence of events and states that the first --
18   the government first refused to intervene in the second -- in
19   Barajas' second action.  Then the government, which in this
20   case meant the Department of Justice, settled the first
21   action making it impossible for Barajas to proceed with that
22   second action.

23       So in both Barajas and Bledsoe, the court was
24   invoking the alternate remedy provision after an earlier
25   settlement with the Department of Justice had cut off the

31

1    rights of the Relator.

2           The Ninth Circuit, in that same paragraph, goes on to

3    note that the notable consequence is that the government now

4    hopes to avoid paying Barajas the Relators' share to which he

5    would have been entitled.  In other words, the purpose of the

6    alternate remedy statute was to protect the rights of the

7    Relator.

8           We similarly cited legislative history in our brief

9    that supports the fact that the alternate remedy provision is

10   a tool intended to give the Relator rights where they would

11   otherwise be cut off, not to give the defendant rights to cut

12   off an action to begin with.

13          No court has ever dismissed a False Claims Act case

14   on the basis of an alternate remedy provision.  The alternate

15   remedy provision is to the benefit of the defendant.

16          The government would also like to emphasize that the

17   University of Phoenix is not correct in describing that this

18   would be a narrow ruling.  This would be a very broad ruling,

19   even broader than the Relators' counsel has laid out.

20          The government needs to be able to rely upon the

21   settlements that it enters into.  If this Court were to find

22   that an administrative settlement that expressly excludes

23   False Claims Act liability nonetheless amounts to a

24   resolution of False Claims Act liability, whether through

25   preclusion, the Court in satisfaction, or even the alternate

32

1  remedy provision, then the government has no ability to

2  exclude fraud claims from an administrative settlement.

3        Not just every qui tam, but every administrative

4  settlement that every agency would attempt to enter into

5  would have to be subject to DOJ review and approval in order

6  to protect the rights of the government to recover for fraud,

7  not just Education, the Department of Health and Human

8  Services, the Department of Defense, the Department of

9  Agriculture.

10        Those agencies could not enter into an administrative

11  agreement that excludes fraud liability with any assurance

12  that that exclusion would not be overwritten at a later

13  proceeding that DOJ tries to bring.

14        Therefore, as I say, DOJ conceivably would have to

15  investigate every administrative settlement to determine

16  ex-ante whether there is a fraud liability there.  And

17  playing into that is -- Well, that makes that point.

18        Again, Your Honor, we would emphasize that this would

19  be -- We're not here just for this case.  We are here because

20  a ruling in favor of the defendants here would be

21  wide-ranging and frankly debilitating to the government.

22        Again, no court has previously reached the result

23  that the defendants are suggesting here.  We submit that this

24  court should find that the settlement agreement with the

25  Department of Education means what it says on its face, that

33

1   False Claims Act liability was expressly excluded and allowed

2   to continue in the forum of this qui tam case.

3          THE COURT:   What's the relationship between the

4   Attorney General and the Department of Education in this

5   case?

6          Did the Attorney General have any kind of interaction

7   with the Department of Education in connection with the

8   settlement?

9          MR. MAJORS:   We're not aware of any.  However, we

10   would submit that even if the Department of Justice was

11   involved, the fact that the settlement agreement expressly

12   excludes fraud liability nonetheless would allow this case to

13   go forward.

14          But, again, certainly defendants have not been able

15   to cite to any DOJ involvement in the Department of Education

16   proceeding.  And I can't say categorically.  We're a big

17   agency.  I can't give you an assurance that nobody was given

18   a faxed copy of something or other.  But to the best of our

19   knowledge, DOJ had no review or approval of the Education

20   settlement.

21          THE COURT:   Do you perceive the settlement as having

22   any bearing on this case?

23          MR. MAJORS:   Your Honor, I don't think -- It's

24   conceivable that all the way down the road once -- should

25   this case proceed to a verdict in favor of the Relators and

34

1   the United States, if damages are assessed against University

2   of Phoenix, I suspect they would argue that the settlement

3   amount would constitute an offset against those damages.

4           We're not prepared to concede that.  There may be

5   arguments that the settlement is different in type than the

6   False Claims Act money damages.  But I can foresee that

7   argument arising down the road.  But certainly at this stage

8   of the case, no, the settlement and the settlement amount

9   have no relevance to the Court's decision.

10          THE COURT:  Okay.

11          MR. MAJORS:  Thank you, Your Honor.

12          MR. HATCH:  Thank you, Your Honor.

13          Just a couple of points.  I'll try to keep it brief.

14          First, in response to the last point that Mr. Majors

15  made with regard to the role of the Department of Justice in

16  the settlement negotiations with the Department of Ed, I

17  cannot speak to that with firsthand knowledge as to what, if

18  any, involvement they had.

19          I can, again, point Your Honor to the second

20  paragraph of paragraph E of the settlement agreement in which

21  the Department warrants and acknowledges that it's not aware

22  of any investigations, proceedings, actions currently

23  contemplated by or pending before the Department or any other

24  federal agency that relate to the subject matter.

25          The Department gave that representation.  We, as

35

1    counsel for the University of Phoenix, would assume they did

2    proper due diligence and coordination with the rest of the

3    federal government and the executive branch in doing so.

4         And that ties into a point that I think is important

5    that permeated some of the arguments you heard is that we do

6    have one government.  The Department of Education and the

7    Department of Justice are part of the same government.

8    They're not separate governments.

9         And the False Claims Acts is very clear, Your Honor,

10   in the handful of places where it identifies and requires

11   action by the Attorney General as opposed to action by the

12   government.  And the provision of the False Claims Act

13   regarding alternate remedy states (Reading):

14              Any alternate remedy available to the government,

15              including any administrative proceeding to determine

16              a civil monetary fine.

17              (Reading concluded.)

18        Next, Your Honor, I would like to briefly address

19   Barajas and Bledsoe because I think, as some of your

20   questions seem to indicate, that really is the heart of the

21   motion here.

22        And I will agree with Relators' counsel that we too

23   are not aware of any reported decision in which a court has

24   on alternate remedy grounds dismissed a lawsuit.

25        Now, we would contend, Your Honor, that is pretty

1   compelling evidence that this -- that would counter the sky
2   is falling argument that we heard from Relators and DOJ.
3   This isn't something that all of a sudden is going to result
4   in any administrative proceeding leading to this result.

5        But I would point out that while no court has
6   dismissed based on alternate remedy grounds, in Barajas it
7   was very clear that the only reason the Ninth Circuit didn't
8   is because there was another basis for dismissal available to
9   it and a basis that it took.

10       In Barajas the language, again, could not be much
11  more clear that the use of the term "alternate remedy" makes
12  clear that the government must choose one remedy or the
13  other, it cannot choose both.

14       Bledsoe is even more clear.

15       THE COURT:  What part of the government was
16  referenced by the Ninth Circuit at that location of the
17  opinion, at that point that you're reading from?

18       MR. HATCH:  In Barajas, of course, the settlement
19  agreement was with the Air Force.  It was an agreement
20  involving suspension or debarment proceedings, which the
21  Ninth Circuit acknowledged is quite far removed from False
22  Claims Act liability, certainly far more removed from False
23  Claims liability than what we're talking about here in light
24  of Miss Woodward's declaration tying the Department's program
25  review directly to the qui tam action and confirming that the

37

1   purpose of the review was to quantify the extent of
2   violations and set a monetary fine amount, a penal sanction
3   as she puts it.

4        Bledsoe, Your Honor, I think is even more
5   informative.  And I'll read you a little bit from page 649
6   and 650 that Mr. Rubin neglected.  The opinion --

7        THE COURT:  It's been argued that if I reread
8   Barajas, I'm going to learn that the Attorney General was
9   involved in everything that happened there.  And so
10  therefore, there was direct Attorney General involvement, not
11  just the Department of Air Force.

12       MR. HATCH:  Well, I think, Your Honor, Barajas is a
13  very, very complicated procedural history with a number --
14  with at least two False Claims Act lawsuits involving
15  different issues, with regard to criminal proceedings, with
16  regard to administrative proceedings, including the Air Force
17  suspension/debarment proceedings.

18       I think, Your Honor, that with regard to the
19  suspension/debarment proceedings that was the Air Force.  And
20  I would contend that there was no greater or lesser DOJ
21  involvement in those proceedings than there were in the
22  program review and settlement here.

23       THE COURT:  Why do you contend that?
24       What is the -- what's the evidence that supports it?
25       What is it that you rely on when you make that

38

1  contention?

2      MR. HATCH:  In Barajas, the fact that the settlement

3  in the qui tam action excluded the scope of the release of

4  the settlement, excluded administrative proceedings like the

5  suspension/debarment proceedings.  That's exactly what we

6  have here.

7      Notwithstanding that, the court found that those

8  proceedings in that rare circumstance constituted an

9  alternate remedy.  In fact, I would point you to the language

10  in Barajas on page 1012, you know, saying that (Reading):

11          We do not hold the suspension/debarment proceedings

12          as always an alternate remedy within the meaning of

13          the FCA.  In fact, we believe that it rarely will be.

14          We do hold, however, that in some circumstances a

15          suspension/debarment proceeding can be an alternate

16          remedy.

17          (Reading concluded.)

18      I think if you substitute "Department program review"

19  for "suspension/debarment proceedings," that's exactly what

20  we have here as acknowledged by Miss Woodward's clear

21  testimony in this case.

22      I would like, Your Honor, to address briefly the

23  Bledsoe case because, again, I contend that is even more on

24  point.

25          There, and I'm quoting from the language on page 649

39

1 and 650 that Mr. Rubin did not cite, it says essentially that

2 the government's (Reading):

3    ...principal contention in support is that language

4    of the settlement agreement specifically reserved and

5    excluded claims asserted in Relators' qui tam action

6    from the government's scope and terms.

7    (Reading concluded.)

8   In rejecting that argument, the government noted that

9 the defendants would be forced to pay civil penalties and

10 double or triple damages associated with the very same claims

11 for which they had already paid penalties and damages by way

12 of settlement.

13   Under either result, adverse consequences to either

14 Relator or defendant would ensue that the FCA was not

15 intended.

16   Relators' counsel, DOJ, have said to you repeatedly

17 that the purpose of the alternate remedy provision is to

18 protect the Relators, to protect the government, not to

19 protect defendants.  They haven't given you any basis for

20 that.

21   Barajas, they rejected the government's -- the very

22 same argument the government made.  Bledsoe explicitly

23 recognized the interest of the defendant.  And I would like

24 to also read you the legislative history that they at least

25 acknowledge is potentially relevant.

1        The legislative history says (Reading):

2        The Senate Committee intends that if civil monetary

3        penalty proceedings are available, the government may

4        elect to pursue the claim either judicially or

5        through the administrative civil penalty proceeding.

6        While the government will have the opportunity to

7        elect its remedy, it will not have an opportunity for

8        dual recovery on the same claim or claims.

9        (Reading concluded.)

10        In other words, the government must elect to pursue

11   the False Claims Act either judicially or administratively.

12   As Miss Woodward makes clear --

13        THE COURT:  What's referenced by "government" in that

14   legislative history?

15        MR. HATCH:  The government?

16        The government of the United States.

17        THE COURT:  Well, I think it has been argued that the

18   government, as referenced in a statute, is the Attorney

19   General, not another federal agency of the United States.

20   That's why I asked you that question.

21        MR. HATCH:  I don't -- Well, Your Honor, again I

22   would refer you back to the False Claims Act.  The False

23   Claims Act is very specific.  And in a handful of places

24   within that statute, it does use the term "Attorney General."

25        In the majority of places throughout the statute, it

1   uses the term "government."  It does not define "government"

2   as the Attorney General.  And it's specific with regard to

3   those place where it has to be the Attorney General and those

4   places where it's the government's conduct, the government's

5   action.

6          THE COURT:  How do you know that when it is talking

7   about "government" in other places that it doesn't assume

8   that the reader understands that "government" means "Attorney

9   General?"

10         MR. HATCH:  Well, I would assume first on the plain

11  language of the statute.  There is nothing in the statute

12  that defines that.  You could have a definition within the

13  statute.

14         If that was something that was prominent within the

15  legislative history or prominent within case law authority,

16  I'm sure that Mr. Rubin or Mr. Majors would have pointed that

17  out to Your Honor.

18         THE COURT:  Okay.

19         MR. HATCH:  Your Honor, unless you have any further

20  questions, that concludes my argument.

21         THE COURT:  Okay.

22         MR. RUBIN:  Your Honor, if I may make two points with

23  respect to Barajas, the Ninth Circuit case?

24         THE COURT:  All right.

25         MR. RUBIN:  Mr. Majors is correct that the references

42

1    to the United States in Barajas were references to the

2    Department of Justice because -- and I'm looking at page 1008

3    of the decision -- the whole discussion of chronology focuses

4    on the United States' settlement and dismissal -- explicit

5    dismissal of the first False Claims Act claim.

6        Under 3730(b) that can only be with the approval of

7    the Attorney General through the Department of Justice.

8        What happened in Barajas, the Ninth Circuit makes

9    clear, is that the government, through the Department of

10   Justice, resolved through settlement the first qui tam case.

11   And the effect of that settlement was claim preclusion, to

12   preclude the second one from going forward.

13       In that settlement, there was an election made by the

14   only agency that can make such an election, the Department of

15   Justice.  They chose to settle the first claim, to claim

16   preclude the second, but to permit the allegations to go

17   forward in the Air Force suspension and debarment proceeding

18   where they could be resolved.

19       That was the election by the Department of Justice to

20   pursue an alternate remedy.  And the Ninth Circuit said,

21   focusing particularly on 1012 and 1013, that the Relator is

22   entitled to rights in that alternate remedy.

23       Mr. Hatch pointed to a very important clause in the

24   discussion at 1012 when he said that we do not hold --

25   quoting:

43

1          "We do not hold the suspension and debarment

2          proceeding as always an alternate remedy within the

3          meaning of the FCA.  Indeed, we believe that it

4          rarely will be."

5      That's the language he quoted.

6          "We do hold, however, that in some circumstances

7          the suspension or debarment proceeding can be

8          an alternate remedy."

9      The court then goes on to show why in the

10   circumstances in Barajas that was a rare case in which

11   suspension and debarment was viewed as an alternate remedy to

12   protect the Relators' rights.  And the reason was in the

13   following paragraph.

14      The majority went through the chronology and pointed

15   out that the government, the Attorney General, through the

16   powers vested in him in 3730(b), chose to dismiss the first

17   False Claims Act case and permit the second action to go

18   forward -- the second proceeding to go forward.  That was the

19   election made.

20      It is only when a suspension and debarment proceeding

21   follows the decision by DOJ to shutdown the qui tam claim

22   that there is an election to pursue an alternate remedy.

23      If the University of Phoenix were correct, every time

24   there is a suspension and debarment proceeding after

25   non-intervention, it would be an alternate remedy.

44

1      Every time the Department of Agriculture, Education,

2  so on and so forth, pursues any remedy at all with a factual

3  overlap, it would wipe out the right to proceed on a False

4  Claims Act claim.

5      That has never been the law.  You would be the first

6  court in the country to hold that a defendant can obtain

7  dismissal of a False Claims Act case based on this alternate

8  remedy provision where the parties to an administrative

9  proceeding have said it does not have that effect, that is

10 not our intent, and it covers a more limited factual period.

11     Thank you, unless you have further questions, Your

12 Honor.

13     THE COURT:  I don't have any further questions.

14     MR. MAJORS:  Your Honor, may I offer one point about

15 the legislative history?

16     THE COURT:  Okay.

17     MR. MAJORS:  Your Honor, we would suggest that the

18 Court review page 5 of our Statement of Interest quoting the

19 Senate Report that sets forth the legislative history of this

20 provision where it says that subsection (c)(3) of Section

21 3730, which is how the alternate remedy provision was

22 numbered at the time, clarifies that the government, once it

23 intervenes and takes over a False Claims Act suit brought by

24 a private individual, may elect to pursue any alternate

25 remedy for recovery of the false claim.

1         Plainly, the only -- the only authority within the

2    government to intervene in a False Claims Act case is the

3    Department of Justice.  And therefore, we would submit that

4    references to "the government" in the legislative history and

5    the statute do refer to the Attorney General and DOJ.

6         It is true that Barajas and Bledsoe came down on

7    procedural history that, frankly, was not contemplated by the

8    legislative history, but in both of those cases again the

9    salient fact was that the earlier settlement that cut off the

10   Relators' rights was executed by the defendant and the

11   Department of Justice.

12        Thank you, Your Honor.

13        MR. HATCH:  Your Honor, my colleague has found an

14   answer to one of your questions that I wasn't fully able to

15   address.

16        THE COURT:  Okay.  Mr. Hatch.

17        MR. HATCH:  With regard to the Department of

18   Justice's role in the Air Force suspension/debarment

19   proceedings in Barajas, in the government's amicus curiae

20   brief, the government states, at page 5 and 6, that the

21   agreement was negotiated by and on behalf of the Air Force.

22   The agreement itself recites that it is made between Northrop

23   and the Air Force acting on behalf of the Department of

24   Defense.

25        The Department of Justice was not a party to the

46

1  administrative proceedings, nor was it a signatory to the

2  agreement.  The Relator and his counsel played no role

3  whatsoever in the process.

4       Thank you.

5       MR. RUBIN:  And, of course, Your Honor, our point is

6  that the Department of Justice negotiated the earlier

7  settlement, the one that had the claim preclusive effect.

8       We're not focusing on the final resolution of the

9  suspension and debarment proceeding because that wasn't the

10  election.  The election was when the Department of Justice

11  said qui tam case over, we're proceeding instead through

12  suspension and debarment.  So that's not at all inconsistent

13  with our position.

14       THE COURT:  I'm going to submit the matter.

15       MR. RUBIN:  Thank you, Your Honor.

16       MR. HATCH:  Thank you, Your Honor.

17       (Off the record at 11:12 AM)

18                      ---oOo---

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2                         ---o0o---

 3
      STATE OF CALIFORNIA  )
 4    COUNTY OF SACRAMENTO )

 5


 6
            I certify that the foregoing is a correct transcript
 7
      from the record of proceedings in the above-entitled matter.
 8

 9


10                  IN WITNESS WHEREOF, I subscribe this
      certificate at Sacramento, California on this 27th day of
11    AUGUST, 2007.

12

13

14                          _____

15                          CATHERINE E.F. BODENE,
                            CSR NO. 6926
16

17

18

19

20

21

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

# Exhibit B

Advertisement  Case 2:03-cv-00457-GEB-DAD    Document 91    Filed 09/11/07    Page 53 of 66

**College & University**
Performance Conference 2007

October 29-31, 2007
Arlington, VA
www.ASMIweb.com



Aug. 21

# U. of Phoenix Case Lurches Toward Trial

A federal judge has rejected the latest attempt by the University of Phoenix to shortcircuit a potentially massive lawsuit it faces, increasing the chances that the five-year-old case actually goes to trial.

The case, which has been rattling around the federal courts since 2002, hinges on the question of whether the enormous for-profit university violated federal law by paying its recruiters based on how many students they enrolled. A federal appeals court ruled last fall that Phoenix had to defend itself against the charges brought by two former instructors on behalf of the federal government under the False Claims Act, which allows individuals who believe they have identified fraud committed against the government to sue, hoping to be joined by the U.S. Justice Department. (The plaintiff then shares in any financial penalties, which can include trebled damages.)

Phoenix officials had their way in the early court battles, with a federal district court twice dismissing the lawsuit in 2004. But the university's fortunes began to ebb with the September 2006 ruling by the U.S. Court of Appeals for the Ninth Circuit that was seen by many college lawyers as one of several recent decisions expanding the applicability of the False Claims Act to higher education. Since then, the entire Ninth Circuit court denied a Phoenix petition asking it to rehear the case, and the U.S. Supreme Court refused to hear Phoenix's appeal.

On Friday, Judge Garland E. Burrell Jr., in the U.S. District Court for the Eastern District of California, rejected Phoenix's argument (made in this legal filing) that the university could no longer be a legitimate defendant in a False Claims Act lawsuit. The university argued that in agreeing to a 2004 settlement with the university, in which Phoenix agreed to pay $9.8 million to the U.S. treasury, the federal government (through the U.S. Education Department) had accepted an "alternate remedy" to the judgment sought by the plaintiffs, rendering the False Claims Act lawsuit moot.

But the plaintiffs — and the U.S. Justice Department, which filed a brief on their behalf — argued that the settlement could not be seen as an alternative to a ruling in the plaintiffs' lawsuit because the Justice Department must sign off on all False Claims Act resolutions, and the attorney general had played no role in the Education Department's settlement with Phoenix. Judge Burrell, in a terse ruling released Monday, sided with the plaintiffs and against Phoenix.

"While we are disappointed with the court's decision, we look forward to trying this case on its merits," said Timothy J. Hatch, a lawyer with Gibson Dunn & Crutcher, which is representing Phoenix. "We are confident the evidence will support the fact that University of Phoenix fully complied with the law. The plaintiffs are trying to twist a routine regulatory matter into a federal case of fraud and will not succeed." Hatch said in an interview Monday that the university was likely to ask higher courts to review Judge Burrell's ruling, but that it did not expect to prevail.

Nancy G. Krop, a lawyer representing the women who are suing Phoenix, said the decision meant that "we finally have a courtroom" in which to pursue the merits of their case. Krop said she expected to perform extensive discovery aimed at showing that the university paid its recruiters based on how many students they enrolled.

Case 2:03-cv-00457-GEB-DAD    Document 81    Filed 09/11/07    Page 54 of 66

She said she expected the university to ask a judge to rule in its favor on summary judgment, but that she believed a trial will eventually be held on its current schedule — in September 2009.

— Doug Lederman

*The original story and user comments can be viewed online at http://insidehighered.com/news/2007/08/21/phoenix.*

© Copyright 2007 *Inside Higher Ed*

# Exhibit C

LAW.COM **Quest** Search the Legal Web

Relevant resul



Law.com Home    Newswire    LawJobs    CLE Center    Online Store    Our Sites    Advertise

# CAL LAW
**CALIFORNIA'S LEGAL NEWS SOURCE**

| home | decisions | recent stories | subscribe | find a job | advertise | contact us | announcements |

Home > Plaintiff Bar Eyes Big False Claims Case

Font Size: ⊕⊖ |    Print |    Email

## Plaintiff Bar Eyes Big False Claims Case

The Recorder
**By Matthew Hirsch**
August 22, 2007

Seeing the potential for billion-dollar damages, lawyers who sue over government contracts are watching a false claims suit against the University of Phoenix. On Friday, a federal judge in Sacramento cleared the case for trial.

At the same time, some plaintiff lawyers are eager to see whether the U.S. Justice Department will now get off the sidelines and intervene, throwing its weight behind the plaintiffs' case.



Partner Robert Nelson, Lieff Cabraser Heimann & Bernstein.
Image: Jason Doiy / The Recorder



AME

• Eve
• Articles a
Visit Too

**MOST VIEWEI**

1. Window or

2. Sidebar

3. Stock Dro

4. Gibson Ba

5. Quinn Ema

And others in the plaintiff bar will be looking to see whether the case expands the scope of the False Claims Act, which was once largely aimed at defense contractors and the medical services industry.

"If enforced, the Act [can] be used to combat all types of fraud," said Niall McCarthy, a partner at Burlingame's Cotchett, Pitre & McCarthy who is not involved in the suit.

Two former University of Phoenix enrollment counselors filed the case in 2003, claiming that the Internet-based school knowingly misled the U.S. Department of Education to become eligible for its students to collect financial aid.

The plaintiffs, Mary Hendow and Julie Albertson, allege that the university paid its enrollment counselors "based directly on enrollment activities," even as it told the government otherwise. Under Title IV of the Higher Education Act, universities that qualify for aid are barred from giving recruiters incentives, like commissions and bonuses, to boost enrollment. The suit seeks damages for federal loans and grants obtained by thousands of students.

Three years ago, the case looked dead in the water: U.S. District Judge Garland Burrell Jr. rejected two false claims theories presented by the plaintiffs. But a Ninth Circuit U.S. Court of Appeals panel led by Judge Cynthia Holcomb Hall reversed (.pdf) Burrell's decision, finding that both of the plaintiffs' theories were viable.

That was "a very strong opinion from a very conservative panel," said Robert Nelson, a partner at Lieff Cabraser Heimann & Bernstein in San Francisco.

Not long after the Ninth Circuit published its opinion, the original plaintiff lawyers — Redwood City solo Nancy Krop and Novato attorney Daniel Bartley — signed up Nelson, Altshuler Berzon's Michael Rubin and McGuinn, Hillsman & Palefsky's Cliff Palefsky.

With *Hendow v. University of Phoenix*, 03-457, set for trial in September 2009, Nelson predicted that litigation expenses, including a full-fledged discovery battle with the university's defense team at Gibson, Dunn & Crutcher, could cost $1 million or more.

"It could get costly quite quickly, and the point is to match resources with the other side," he said.

---

**Others in the plaintiff bar will be looking to see if the case expands the scope of the False Claims Act, which was once largely aimed at defense contractors and the medical services industry.**

---

While Nelson estimated that eventual damages could exceed $1 billion, the university's defense counsel countered that the exposure would be much less, because the government wouldn't claim damages on loans students have repaid.

Burrell set the stage for trial Friday when he denied the University of Phoenix's second motion to dismiss.

Timothy Hatch, a Los Angeles partner at Gibson, Dunn, had tried to argue that the university had effectively resolved the dispute in *Hendow.* It settled an administrative action by the Department of Education by paying $9.8 million while the Ninth Circuit had *Hendow* under review.

But Burrell rejected that theory in a terse, four-page decision (.pdf): "Since the settlement agreement did not constitute an 'election' of an 'alternate remedy' by the 'government' within the meaning of the [False Claims Act], the … action is not moot."

On Tuesday, Hatch said the ruling was disappointing but not a surprise. "We recognize that while we're right [on the law], this is an issue under the False Claims Act that hasn't been very well developed."

Though the Justice Department hasn't formally intervened in the University of Phoenix case, one of its lawyers in Washington, D.C., argued in court papers for Burrell to reject the second motion to dismiss.

On Tuesday, Sacramento-based Assistant U.S. Attorney Kendall Newman, who is monitoring the case, wouldn't rule out more involvement by the government. "That is always a possibility. It's one thing we continually look at."

Hatch said it's "obviously very significant" that the government hasn't intervened yet. "There's been a lot of water under the bridge," he observed.

Some plaintiff attorneys say that in recent years the Justice Department has let private counsel conduct discovery by themselves, waiting until just before trial to intervene.

Rubin, the Altshuler Berzon attorney, said plaintiffs have less of a problem now when the government sits out the early stages of a case than they did when false claims cases were a more novel occurrence some

Still, Rubin said, "It's always useful to have the support of the government in a case you're bringing on behalf of the government."

"We're exceedingly grateful for the DOJ's participation," Nelson added, "and we hope it continues."

Eric Havian, a partner at San Francisco's Phillips & Cohen who is not involved in the case, said "it looks bad" for the Department of Justice if it refuses to take a big case and private attorneys win a big judgment at trial. "People begin to wonder, 'Hey, isn't that what we're paying you for?'"

In a case against Wall Street money manager Mario Gabelli that settled last year for $130 million, the Justice Department joined in only as a trial date approached, said Havian, who worked on that case.

"I wouldn't be surprised to see something similar happen with University of Phoenix."

---

Terms & Conditions  |  Privacy  |  Advertise  |  Help  |  About Cal Law



About Al

Copyright 2007

# Exhibit D

1 of 1 DOCUMENT

Copyright 2007 Los Angeles Times
All Rights Reserved
Los Angeles Times

August 21, 2007 Tuesday
Home Edition

**SECTION:** CALIFORNIA; Metro Desk; Part B; Pg. 3

**LENGTH:** 577 words

**HEADLINE:** School's enrollment fraud case heads to trial;
A judge rejects the University of Phoenix's argument that a previous settlement with the U.S. should end whistle-blowers' suit.

**BYLINE:** Henry Weinstein, Times Staff Writer

**BODY:**

A federal judge in Sacramento has rebuffed efforts by the nation's largest for-profit school chain to dismiss a massive fraud case, paving the way for a trial in which the University of Phoenix could be liable for millions of dollars in damages.

U.S. District Judge Garland E. Burrell, in an order released Monday, rejected the university's contention that a $9.8-million settlement it made with the federal government should end the lawsuit.

The case stems from allegations by two former University of Phoenix enrollment counselors, Julie Albertson and Mary Hendow, that the school violated federal rules by offering incentives to employees, including higher salaries and more benefits, based on the number of students they enrolled.

The university, with 180 campuses and more than 310,000 students in 39 states, Canada, Mexico, the Netherlands and Puerto Rico, is the largest subsidiary of Apollo Group Inc., a publicly traded education provider based in Phoenix.

About 80% of the university's students are on federal financial aid, and the school collects about $2 billion a year from those taxpayer-subsidized students, government records show.

The case was filed under the federal False Claims Act, which permits private individuals to sue on behalf of the government and to share in the recovery if the suit is successful.

Last year, the university paid the U.S. Department of Education to settle allegations similar to those made in the lawsuit -- numerous violations of the Higher Education Act provision that prohibit colleges from paying recruiters based solely on enrollment numbers.

In June, the university's lawyer, Timothy J. Hatch, said the settlement represented an "alternate remedy" to the lawsuit.

But lawyers for the whistle-blowers, supported by a Justice Department attorney, countered that the settlement stated explicitly that the Department of Education did not have the authority to "waive, compromise, restrict or settle . . .

School's enrollment fraud case heads to trial; A judge rejects the University of Phoenix's argument that a previous settlement with the U.S. should end whistle-blowers' suit. Los Angele

any past, present or future violations" by the university of criminal laws or any action initiated against the school for fraud under the False Claims Act.

Justice Department lawyer Jay D. Majors said that if Phoenix prevailed, it would have "wide-ranging and debilitating" ramifications for the government's efforts to combat fraud.

Burrell, in a short decision dated Friday, agreed with the plaintiffs.

San Francisco lawyer Michael Rubin, who argued the case for the plaintiffs, said he was pleased with the ruling.

"The next step is for us to prove that the university did, in fact, falsely certify" that it had complied with federal law, "and did, in fact, pay its recruiters based on the number of students they enrolled, whether qualified or not," Rubin said.

His co-counsel, Nancy Krop of Redwood City, Calif., said that the Department of Education had interviewed more than 90 people while investigating the chain and all of them were potential witnesses in a trial, scheduled to start in September 2009. In addition to interviewing witnesses, she said, the plaintiffs would seek reams of documents.

Hatch said he was disappointed with the ruling but "quite confident" that the evidence would show that the university had "fully complied with the law." He said the allegations were "easy to make but difficult to prove."

The university, Hatch said, takes "a large number of factors" into consideration in determining the salaries of its enrollment counselors, not only the number of recruits.

henry.weinstein@latimes.com

**LOAD-DATE:** August 21, 2007

# Exhibit E

1 of 1 DOCUMENT

Copyright 2007 San Jose Mercury News
All Rights Reserved
San Jose Mercury News (California)

August 21, 2007 Tuesday

**SECTION:** LOCAL; State; News

**LENGTH:** 407 words

**HEADLINE:** Fraud case heads to trial

**BYLINE:** By Patrick May Mercury News

**BODY:**

A whistle-blower fraud case against the nation's largest vocational school is heading to trial after a federal judge in Sacramento on Monday refused to dismiss a lawsuit that could cost the University of Phoenix millions of dollars.

The suit accuses the school of using high-pressure tactics to recruit students.

After several years of appeals that brought the case to the U.S. Supreme Court, U.S. District Judge Garland E. Burrell's ruling gives a green light to the suit brought by two ex-recruiters at the university's San Jose office. They claim the school's practice of tying their salaries to the number of students they enrolled violates federal law, while filling the school's coffers with financial aid.

Mary Hendow of Los Altos and Julie Albertson of Belmont filed the lawsuit in 2003, accusing the university of fraudulently obtaining hundreds of millions of dollars in financial aid, often by signing up unqualified students who later drop out or default on their loans. They allege the school illegally used bigger salaries, benefits and even DVD players and spa vacations to reward recruiters who signed up the most students. The lion's share of the university's funding comes from taxpayer dollars in the form of federal aid.

Nancy Krop, the plaintiffs' Redwood City attorney, said the failed motion was inspired by a 2003 Department of Education review into similar claims as those raised in the lawsuit. After the school paid the government $9.8 million to settle those allegations, she said, "they filed the motion saying the government had agreed the allegations had been resolved and the case should be thrown out. But the court today ruled no."

The university's attorney Timothy J. Hatch, of Gibson, Dunn & Crutcher in Los Angeles, said he was disappointed by the ruling but confident the university would win. "We didn't want to waste time and resources defending what we feel is a frivolous lawsuit, but we're ready to move forward now and we're confident we'll prevail."

There's a lot at stake. The prospect of having to turn over as much as $2 billion to the government in grant reimbursements and penalties could threaten the university's survival, Krop said. While most of the damages would go to the federal government, the plaintiffs would be entitled to claim as much as 30 percent of the total as a reward for blowing the whistle on their former employer.

Contact Patrick May at pmay@mercurynews.com or (408) 920-5689.

Fraud case heads to trial San Jose Mercury News (California) August 21, 2007 Tuesday

**LOAD-DATE:** August 21, 2007

# Exhibit F

THE CHRONICLE OF HIGHER EDUCATION

*News Blog*
Higher-education news from around the Web

**August 21, 2007**

**Judge Rejects U. of Phoenix Bid for Dismissal of Whistle-Blower Lawsuit**

The University of Phoenix has failed in another attempt to get a federal judge to dismiss a whistle-blower lawsuit against it.

The for-profit institution, the country's largest private university, is being sued under the federal False Claims Act by two former admissions recruiters who allege that it obtained billions of dollars in student-aid money while violating federal policies on how it compensated recruiters.

The case was initially dismissed and then reinstated by a federal appeals court. Phoenix then tried unsuccessfully to have that decision reversed by the U.S. Supreme Court, but in April, the high court declined to take the case, sending it back to a federal court in California for trial.

It was there that Phoenix, which is owned by the Apollo Group Inc., sought another dismissal, arguing that a settlement it reached with the U.S. Department of Education in 2004 should have ended the lawsuit because there were no more issues to be resolved. But the two whistle-blowers and the U.S. Department of Justice countered that the settlement did not constitute an "alternate remedy" required under the False Claims Act because it was never approved by the U.S. attorney general.

In a ruling made public on Monday, Judge Garland E. Burrell Jr. of the U.S. District Court in Sacramento ruled against Phoenix and said that the lawsuit was "not moot" on account of the 2004 settlement. —*Goldie Blumenstyk*

http://chronicle.com/news/article/2888/judge-rejects-u-of-phoenix-bid-for-dismissal-of-whistle-blower-lawsuit